## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WILLIAM MICKENS, individually and on behalf of all others similarly situated,** | Civ. No. 2:10-5842 (KM) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| **FORD MOTOR COMPANY,** | |
| **Defendant.** | |

### KEVIN MCNULTY, U.S.D.J.:

Plaintiff William Mickens, a car purchaser, brings this action individually and on behalf of others similarly situated against Ford Motor Company. The Amended Class Action Complaint (the "Complaint," cited as "AC"), contains three counts. It alleges violations of the New Jersey Consumer Fraud Act (the "CFA"), N.J. Stat. Ann. § 56:8-2, in connection with an alleged galvanic corrosion defect in the hood panels of fourteen makes and models of vehicles designed and manufactured by Ford. This motion is decided without oral argument. *See* Fed. R. Civ. P. 78(b).

Ford has moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under the CFA. According to Ford:

(1) Count I does not adequately allege how the Defendant's failure to report the alleged defect to the New Jersey Division of Consumer Affairs caused the Plaintiff's loss;

(2) Count II does not adequately allege a material omission because Ford's warranty disclosed the galvanic corrosion defect; and

(3) Count III does not adequately allege a deceptive practice with respect to Ford's warranty scheme, and it does not allege misrepresentations or omissions at all.

For the reasons set forth below, the Defendant's motion to dismiss is granted as to Count I only, and Count I is dismissed with prejudice. Although failure to report certain defects as required by the New Jersey Lemon Law, N.J.

1

Stat. Ann. § 56:12-44, is a *per se* violation of the CFA, Mickens has not adequately pleaded that such a reporting violation caused his loss. The Defendant's motion is denied as to Count II because warranty coverage of a potential defect does not relieve a manufacturer, as a matter of law, from a knowing-omission claim under the CFA. Defendant's motion is denied as to Count III because Mickens has sufficiently alleged deceptive conduct, as opposed to factual misrepresentations, in connection with the galvanic corrosion defect and Ford's warranty program.

## I.   BACKGROUND

### A.  The Plaintiff's Experience with His Ford Mustang

On September 29, 2005, the Plaintiff, William Mickens, purchased a new 2006 Ford Mustang GT. (AC ¶ 47 [ECF No. 25]). As purchaser, Mickens received a New Vehicle Limited Warranty, which included "Corrosion Coverage" for a period of five years with no mileage limitation. (*Id.* ¶ 48). That five-year "Corrosion Coverage" excluded corrosion that did not perforate a body panel. Mickens also received "Bumper to Bumper" coverage for three years or 36,000 miles, whichever came first. (*Id.* ¶ 48).

In June 2008, Mickens noticed galvanic corrosion[1] on the hood of his car. (*Id.* ¶ 49). He brought the Mustang back to the dealership where he had purchased it. The dealership performed a repair under the warranty, sanding and painting the affected area of the aluminum hood panel. (*Id.*). In June 2009, about one year later, and now outside of the 36-month "Bumper to Bumper" warranty coverage period, Mickens again noticed galvanic corrosion on the hood of his car. (*Id.* ¶ 50). He brought his car back to the dealership, which attempted but failed to fix the corrosion damage. (*Id.*). The corrosion worsened over the next few months, which led Mickens to bring his car to the dealership three times from August through December 2009. (*Id.* ¶ 51). Each time, the

---

[1]       The Complaint describes galvanic corrosion as:

> [A] process by which two metals with different electrode potentials come into contact in the presence of electricity. This contact, called a galvanic coupling, causes the more active metal (the anode) to give its electrons up to the less active metal (the cathode), resulting in the accelerated corrosion of the anodic metal. . . . The aluminum hood panel design change caused a galvanic coupling in the subject vehicles because aluminum is anodic to most other metals, including iron. Thus, wherever . . . the aluminum hood panels came into contact with iron-based parts, they sacrificed their electrons to the surrounding iron parts, thereby suffering a premature loss of structural integrity due to galvanic corrosion.

(AC ¶¶ 27-28 [ECF No. 25]).

2

dealership was unable to eliminate the corrosion and eventually a dealership representative told the Plaintiff that he would have to either purchase a new hood or pay for any further repairs. (*Id.* ¶ 51). During one of the 2009 visits, a dealership employee told the Plaintiff that the corrosion was "common to a lot of Ford vehicles" and that "Ford is not going to do anything about it." (*Id.* ¶ 52).

In December 2009 and January 2010, Mickens complained to the Ford Motor Company regarding the corrosion on his hood and the dealership's failure to repair it. (*Id.* ¶ 53). Ford told Mickens to arrange for repairs with the dealership. (*Id.* ¶ 53). In May 2010, the dealership again told Mickens that he would have to pay for any work done by the dealership's body shop (*Id.* ¶¶ 53-54). The dealership's body shop advised Mickens that fixing the galvanic corrosion problem would cost $800 plus the cost of a replacement hood; it declined to provide a written estimate of the total cost. (*Id.* ¶ 55). From two local, independent body shops Mickens received respective total cost estimates of $1,917.84 and $2,492.96 for replacing the hood and repairing the corrosion damage. (*Id.* ¶ 56). Mickens does not allege that he has had anyone perform any repairs relating to the corrosion on his hood aside from the June 2008 warranty repair at the dealership.

### B. The Initial Class Action Complaint

On November 11, 2010, Mickens filed the Initial Class Action Complaint. That complaint alleged a violation of the CFA, N.J. Stat. Ann. § 56:8-2, based on Ford's noncompliance with the New Jersey Lemon Law, N.J. Stat. Ann. § 56:12-44. It also alleged unjust enrichment. (Initial Class Action Compl. ¶¶ 63-77 [ECF No. 1]). On August 5, 2011, Judge Wigenton granted Ford's motion to dismiss without prejudice and gave Mickens thirty days to amend the Complaint.

### C. The Amended Class Action Complaint

On September 7, 2011, Mickens filed a proposed Amended Class Action Complaint against Ford, which designed, manufactured, marketed, sold, serviced, and warranted the vehicles at issue.[2] (AC ¶ 5 [ECF No. 25]).

That Complaint alleges that around 1998 or 1999, in order to remedy its noncompliance with the Corporate Average Fuel Efficiency mileage standard and to avoid potential government fines or sanctions and negative publicity, Ford changed the design of many of its 2000 model year vehicles to include a

---

[2]   The allegations of the Complaint have not yet been tested by any fact finder. This discussion, as it must, assumes their truth solely for the purpose of analyzing Defendant's Rule 12(b)(6) motion. *See* p. 5, *infra.*

The plaintiff has not yet moved for class certification. The proposed class encompasses purchasers of fourteen models of vehicles designed and manufactured by Ford. (AC ¶ 6 [ECF No. 25]).

hood panel made of aluminum instead of iron. (*Id.* ¶¶ 31, 20-22). Ford did not, however, replace the iron-based parts used to connect to or support the aluminum hoods, nor did it do anything to change the flow of electrical current across and through the hood panels of these vehicles. (*Id.* ¶¶ 25-26).

Mickens states that the design change caused all of the vehicles at issue to suffer from galvanic corrosion, a process that occurs in the presence of electricity whereby a metal with a more active electrode potential gives up its electrons to the less active metal. (*Id.* ¶ 27). Because aluminum is more active than iron, an aluminum hood connected to iron in the presence of an electrical current would experience galvanic corrosion. (*Id.* ¶ 28). The galvanic corrosion led to the vehicles suffering a premature loss of structural integrity. (*Id.*). According to the Complaint, this premature loss was consistent across all of the year 2000 models with the design change because galvanic corrosion is "constant across all environments and conditions and is not subject to individual variables such as environment or driver operation." (*Id.* ¶ 29).

According to the Complaint, Ford was aware of the scientific principles underlying galvanic corrosion. Further, Ford was on notice that such a problem could arise because of (1) Ford's experience with previous vehicle designs that led to galvanic corrosion in bumpers and engines, (2) its funding and sponsorship of galvanic corrosion studies, and (3) its participation in industry groups, through which it obtained technical and scientific information relating to galvanic corrosion. (*Id.* ¶¶ 32-34). Despite this knowledge, Ford changed the design of its hood panels in a way that promoted galvanic corrosion. (*Id.* ¶ 35).

The Complaint alleges that Ford structured its warranties to unfairly limit its responsibility for repairs of galvanic corrosion. (*Id.* ¶ 36). Galvanic corrosion tends not to perforate a vehicle's body panel. (*Id.*). Ford's five-year, unlimited-mileage warranty includes coverage for corrosion, but only corrosion that perforates the body. Non-perforating corrosion is covered only under the three-year/36,000 mile warranty. (*Id.*). In this way, Ford limited the cost of corrosion-related repairs and shifted that cost to purchasers like the Plaintiff. (*Id.* ¶¶ 111, 113).

By 2004, the increased corrosion as a result of the design change was apparent. On December 27, 2004, Ford issued to its authorized service representatives a Technical Service Bulletin ("TSB"), reference number 04-25-1, entitled "Aluminum Corrosion – Service Tip." (*Id.* ¶ 38). That TSB noted that twelve models of Ford, Lincoln and Mercury vehicles of model years 2000 to 2004 "may exhibit a bubbling or blistering under the paint on aluminum body parts . . . ." (*Id.*). That TSB instructed Ford's authorized service representatives to sand and paint the affected area, but did not instruct them to address the underlying galvanic coupling that was causing the problem. (*Id.* ¶ 39).

4

Nearly two years later, Ford again addressed the galvanic corrosion problem in a bulletin. Ford published to its authorized service representatives a second TSB on December 11, 2006, reference number 06-25-15, entitled "Aluminum Body Panels – Corrosion – Service Tip." (*Id.* ¶ 41). This TSB noted that fourteen models of Ford, Lincoln and Mercury vehicles "may exhibit a bubbling or blistering under the paint on aluminum body parts . . . ." (*Id.*). The 2006 TSB recommended the same cosmetic repair as did the 2004 TSB. (*Id.* ¶¶ 41-42).

Based on these facts, Mickens raises three causes of action under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2. Count I alleges that Ford violated the CFA by failing to certify to the Division of Consumer Affairs the existence of a design defect common to all motor vehicles of a particular model or make, as required by New Jersey's Lemon Law, N.J. Stat. Ann. § 56:12-44. (*Id.* ¶ 65). Count II alleges that Ford violated the CFA by failing to disclose to purchasers the galvanic corrosion defect. (*Id.* ¶ 85). Count III alleges that Ford violated the CFA in that it engaged in deceptive conduct by limiting the warranty coverage of damage typically caused by galvanic corrosion. (*Id.* ¶¶ 107-113).

On October 26, 2011, Ford moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the amount in controversy exceeds $5,000,000 and diversity exists between Plaintiff Mickens, a resident of New Jersey, and the Defendant, a Delaware corporation headquartered in Michigan, this Court has jurisdiction over the dispute pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

## II.   LEGAL STANDARDS AND BACKGROUND

### A.  Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party, ordinarily the defendant, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). For purposes of a motion to dismiss, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by subsequent Supreme Court case law).

In recent years, the United States Supreme Court has elaborated on the standards that a court is to apply in analyzing a Rule 12(b)(6) motion to dismiss, particularly in light of the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, demonstrating that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 70-73 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209-211 (3d Cir. 2009). The Court of Appeals recently summarized the three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See [Iqbal,* 556 U.S.] at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, No. 10-3629, Slip op. at 19 (3d Cir. Sept. 24, 2012).

Ford asserts that certain of the allegations of the Complaint sound in fraud and therefore must be pleaded with additional particularity. *See* Section III.B, *infra*. Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement for allegations of fraud, including CFA claims, over and above that required by Rule 8(a). *Hughes v. Panasonic Consumer Elecs. Co.*, No. 10–846, 2011 U.S. Dist. LEXIS 79504, at *29, 2011 WL 2976839 (D.N.J. July 21, 2011). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). That heightened pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient

6

particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007) (internal quotation and citation omitted). "To satisfy this heightened standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* "Plaintiff must also allege who made the misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.,* 361 F.3d 217, 224 (3d Cir. 2004) (internal citation omitted); *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir. 2006) ("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.") (internal quotation and citation omitted)).

B. The CFA

All three of the Plaintiff's causes of action arise under the CFA. In a diversity case this court must interpret substantive state law in accordance with rulings of the state's highest court. Lacking such specific guidance, it must predict how the state court would resolve the issue. *Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 220-21 (3d Cir. 2008); *Norfolk Southern Ry. Co. v. Basell USA Inc.,* 512 F.3d 86, 91-92 (3d Cir. 2008); *see generally Erie R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). The New Jersey Supreme Court, as it happens, has interpreted the CFA with some frequency.

The CFA affords a private right of action to consumers who have suffered unconscionable or fraudulent practices in the marketplace. It is to be liberally construed in favor of the consumer, *see Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 14-15, 647 A.2d 454 (1994), and "applied broadly in order to accomplish its remedial purpose," *Gonzalez v. Wilshire Credit Corp.,* 207 N.J. 557, 576, 25 A.3d 1103, 1114-15 (2011) (quoting *Lemelledo v. Beneficial Mgmt. Corp.,* 150 N.J. 255, 264, 696 A.2d 546, 551 (1997)). Accordingly, the trend under CFA has been one of "constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 604, 691 A.2d 350, 364 (1997).

"To state a *prima facie* case under the CFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Payan v. Greenpoint Mortgage Funding,* 681 F. Supp. 2d 564, 572 (D.N.J. 2010) (citing *Bosland v. Warnock Dodge, Inc.,* 197 N.J. 543, 557, 964 A.2d 741, 749 (2009)); *accord Gonzalez,* 207 N.J. at 576, 25 A.3d at 1115.

Element one, "unlawful conduct," is a term of art. The CFA defines it as

7

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . .

N.J. Stat. Ann. § 56:8–2. These acts are listed in the disjunctive; "proof of any one of those acts or omissions or of a violation of a regulation will be sufficient to establish unlawful conduct under the Act." *Cox*, 138 N.J. at 19, 647 A.2d at 462 (emphasizing the "or" in this section). From this definition, courts have derived three broad categories of unlawful conduct: affirmative acts, knowing omissions, and regulatory violations. *Frederico*, 507 F.3d at 202 (citing *Cox*, 647 A.2d at 462). The "prime ingredient" underlying all types of unlawful conduct is the "'capacity to mislead.'" *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 296 (D.N.J. 2009) (quoting *Cox*, 138 N.J. at 19, 647 A.2d at 462). The definition of unlawful affirmative act or omission is intentionally open-ended, in order to capture the myriad schemes that human ingenuity may engender. *See Gonzalez, supra* (citing *Llemelledo, supra*). The third, regulatory category of unlawful acts, however, tends to present more defined, *per se* violations. That third category incorporates and creates a cause of action for violations of regulations promulgated under the CFA. Such regulations may incorporate, and define as unlawful practices, violations of other statutes and regulations that were designed to protect consumers. *See Cox,* 138 N.J. at 17-19, 647 A.2d at 462; *see also Daaleman v. Elizabethtown Gas Co.,* 77 N.J. 267, 271, 390 A.2d 566, 568 (1978); *Leon v. Rite Aid Corp.,* 340 N.J. Super. 462, 468, 774 A.2d 674, 677 (App. Div. 2001); *Chattin v. Cape May Greene, Inc.,* 216 N.J. Super. 618, 639, 524 A.2d 841, 852 (App. Div. 1987), *aff'd,* 124 N.J. 520, 591 A.2d 943 (1991). For an affirmative act or a regulatory violation, intent is not an essential element, and the plaintiff need not prove that the defendant intended to act unlawfully. To commit an unlawful omission, however, defendant must act with knowledge, and intent is an essential element. *Cox,* 138 N.J. at 17-18, 647 A.2d at 462 (citing *Chattin,* 124 N.J. at 522, 591 A.2d 943 (Stein, J. concurring)); *see also Thiedemann v. Mercedes-Benz USA, LLC,* 183 N.J. 234, 245, 872 A.2d 783, 791 (2005).

Element two, "ascertainable loss," is less central to the contentions on this motion. The CFA provides for recovery of treble damages, reasonable attorneys' fees and costs by "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act...." N.J. Stat. Ann. § 56:8-19. *See Maniscalco v. Brother Int'l Corp. (USA),* 627 F. Supp. 2d 494, 503 (D.N.J. 2009) (citing *N.J. Citizen Action v. Schering-Plough Corp.,* 367 N.J. Super. 8, 12, 842 A.2d 174, 176 (App. Div. 2003). "An ascertainable loss occurs when a consumer receives less than what was promised." *Union Ink Co. v. AT&T Corp.,* 352 N.J. Super. 617, 646, 801 A.2d 361, 379 (App. Div. 2002); *see also Miller v. American Family Publishers,* 284

N.J. Super. 67, 90-91, 663 A.2d 643, 655 (Ch. Div. 1995) ("For their money, they received something less than, and different from, what they reasonably expected in view of defendant's presentations. That is all that is required to establish ascertainable loss . . . ."). *See also Thiedemann*, 183 N.J. at 247-49, 872 A.2d at 792-93 (discussion of "enigmatic" requirement of ascertainable loss in connection with claim of defect in automobile).

Element three, causation, requires "that a causal relationship be established between any ascertainable loss and the unlawful practice condemned." *Ramanadham v. New Jersey Mfrs. Ins. Co.*, 188 N.J. Super. 30, 33, 455 A.2d 1134, 1136 (App. Div. 1982) (claims based on substandard and delayed auto repairs). The statute requires that the claimed loss have occurred "as a result of" the unlawful conduct under the CFA, N.J. Stat. Ann. § 56:8-19. Thus the plaintiff must allege and prove that he has "'suffer[ed] a loss due to an unlawful practice," *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 473, 541 A.2d 1063, 1067 (1988) (quoting *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 271, 390 A.2d 566 (1978)), *i.e.*, that the "unlawful consumer fraud caused his loss." *Cox*, 138 N.J. at 22, 647 A.2d at 464. CFA causation is not infinitely elastic in a but-for sense; a plaintiff's losses must be "particularly proximate to a misrepresentation or unlawful act of the defendant condemned by the [CFA]." *Meshinsky*, 110 N.J. at 473, 541 A.2d at 1067 (quoting *Ramanadham, supra*). Thus, for example, a plaintiff who asserted that a dealership unfairly denied his application to lease a new car had no claim under the CFA for expenses he incurred when his old car broke down a month later. *Feinberg v. Red Bank Volvo, Inc.*, 331 N.J. Super. 506, 511, 752 A.2d 720, 723 (App. Div. 2000).

## III.   DISCUSSION

Ford has moved to dismiss the entire Complaint, which comprises three Counts under the CFA. As noted, the motion is granted as to Count I and denied as to Counts II and III.

### A.  Count I: CFA/New Jersey Lemon Law

In Count I, Plaintiff alleges that the Defendant violated the CFA by failing to certify to the Division of Consumer Affairs the presence of the galvanic corrosion defect as required by Section 16 of the New Jersey Lemon Law. This is CFA unlawful conduct of the "regulation violation" variety.

The unlawful conduct element of CFA may indeed embrace violations of Section 16 of the New Jersey Lemon Law. That infrequently-cited section imposes a reporting requirement:

A manufacturer . . . shall certify to the [Division of Consumer Affairs], within one year of discovery, the existence of any inherent design defect common to all motor vehicles of a particular model or

9

make. Failure to comply with this constitutes an unlawful practice pursuant to section 2 of P.L. 1960, c.39 (C. 56:8-2) [*i.e.*, the CFA, N.J. Stat. Ann. § 56:8-2].

N.J. Stat. Ann. § 56:12-44. The Division of Consumer Affairs has promulgated regulations that incorporate, *inter alia*, the Lemon Law. *See* N.J.A.C. 13:45A-26.1 *et seq.* Such an allegation would therefore appear to satisfy the first, "unlawful conduct" element of CFA as a matter of law. Further, for purposes of this motion, Ford does not appear to contend that Mickens has failed to plead the second CFA element, an "ascertainable loss."

Instead, Ford's motion is directed to the connection between elements one and two; Ford argues that Mickens has failed to plead the third CFA element, causation. Mickens's causation analysis has two parts. The Complaint pleads that (1) if Ford had reported the defect to the Division of Consumer Affairs as required by the Lemon Law, that agency would have required Ford to correct the defect, implement a warranty extension, and provide public notice of the defect, and (2) this would have dissuaded or "prevent[ed] Plaintiff and the class members from purchasing the subject vehicles." (AC [ECF No. 25] ¶¶ 75-83). Ford, however, contends that the Complaint draws no adequate connection between the alleged Lemon Law reporting violation and plaintiff's alleged losses because (1) Mickens did not check with the Division of Consumer Affairs before purchasing his Mustang; (2) Mickens purchased his Mustang before Ford's reporting obligation arose; and (3) the Complaint's description of the actions the Division of Consumer Affairs would have taken if informed of the defect are speculative and unsupported by plausible allegations of fact. (Def. Mem. at 9-16).

To properly allege causation, "plaintiffs must ... plead ... a causal nexus between the alleged act of consumer fraud and the damages sustained." *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 15, 842 A.2d 174, 178 (App. Div. 2003). Here, Mickens must plausibly allege that Ford's failure to certify the galvanic corrosion defect to the Division of Consumer Affairs caused his loss.

First, Mickens's causation allegation depends on the proposition that, if the Division of Consumer Affairs had taken action based on Ford's report of the hood defect, this would have set in motion a chain of events that would have resulted in Mickens (and others) being dissuaded from purchasing the Ford automobiles at issue.[3] Assuming *arguendo* that Ford had reported the defect, the allegations do not suggest plausibly that Mickens would have even known about it before purchasing his vehicle. He does not allege that he did take or

---

[3]    Presumably a prospective purchaser, if not wholly dissuaded from buying the car, might alternatively use the information about the hood defect to bargain for a better price or might decide to purchase additional warranty protection if it were available. The difference is not material for present purposes.

would have taken any steps to verify the existence, or not, of any report to the Division of Consumer Affairs before purchasing his Mustang. He does not allege that he took any steps to determine whether the Division of Consumer Affairs had issued any warning or taken any action with respect to the 2006 Mustang model. In short, there is no plausible factual allegation that a report to the Division of Consumer Affairs, if it had occurred, would have "prevented" this purchase.

In addition, Mickens's causation allegation depends upon actions the Division of Consumer Affairs would hypothetically have taken if Ford had reported the hood corrosion defect. The Complaint alleges that the Division of Consumer Affairs would have required Ford to fix the defect, to extend its vehicles' warranties, or to implement a public notice program. These allegations, however, are predictive and speculative. They need not be accepted as true in the absence of supporting factual allegations. *Iqbal*, 556 U.S. at 668. Such plausible supporting allegations are lacking.

The *Iqbal/Twombly* distinction between "possibility" and "plausibility" is especially poignant as to hypothetical allegations about what might have been. Mickens does not allege *facts* to establish that the Division of Consumer Affairs has the power to take any of the hypothetical remedial actions that he alleges or, having that power, would exercise it. For his counterfactual causation allegation to be plausible, he must allege something in the form of "When the Division of Consumer Affairs is faced by situation X, it does Y; this case presents situation X; therefore the Division, if informed of that situation, would have done Y." And he must plausibly allege that this logical syllogism is grounded in fact. The Complaint does not do this.

Mickens does not, for example, point to any provision in the Division of Consumer Affairs regulations that requires or authorizes such remedial action in response to a Section 16 notification from a manufacturer. The Court takes judicial notice that the Division's regulations do not specifically mention the Lemon Law reporting requirement, N.J. Stat. Ann. § 56:12-44. *See* N.J.A.C. 13:45A-26.1 *et seq.* This is not to suggest that the Division necessarily would lack such authority, a question on which the court does not rule; it is merely to suggest that nothing in the Division's regulations supports an assumption that the Division would have pursued particular remedial measures if it had been informed of a defect.

The Complaint cites no history or established practice of, or precedent for, any particular remedial measures being taken by the Division of Consumer Affairs, particularly in response to a manufacturer's Lemon Law Section 16 notification. That is a grave defect in a Complaint whose allegations of causation rest upon assertions that the Division "would" have mandated design changes, warned the public or taken other remedial action had it only known of the defect.

11

In short, the "plausibility" standard, *see* pp. 5-6, *supra*, requires more than "facts that are merely *consistent with* a defendant's liability." *Twombly*, 556 U.S. at 678 (emphasis added). More specificity is necessary to carry a complaint's hypothetical claims across the line that separates possibility from plausibility.[4] Accordingly, because Mickens has not adequately pleaded the required element of causation, the motion to dismiss Count I will be granted.

Mickens has requested leave to file a second amended complaint should any of his causes of action be dismissed. (Pl. Opp. Mem. at 14). A court may deny leave to amend if such an amendment would be futile, *i.e.*, if it would not survive a motion pursuant to Federal Rule of Civil Procedure 12(b)(6). *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434-35 (3d Cir. 1997).

---

[4]   Ford also asserts two other, alternative grounds for dismissal of Count I. Given the Court's resolution of the causation issue, both may be moot, but I note them briefly.

First, Ford asserts that the causation allegations are defective because Mickens purchased his vehicle on September 29, 2005, before Ford's obligation to report a defect to the Division of Consumer Affairs would have arisen (assuming it did). The Complaint alleges that Ford had general knowledge of galvanic corrosion as far back as 1999; that it knew about the specific hood corrosion issue by 2004; that it issued a bulletin to dealers about corrosion in December 2004; and that it issued another such bulletin in 2006. Ford maintains, for example, that knowledge of general scientific principles governing galvanic corrosion does not constitute knowledge of a specific, model-wide design defect, and that the 2004 bulletin did not cover the 2006 Mustang model that Mickens bought. I need not resolve this issue, but note that it potentially implicates factual questions ill-suited to the context of a motion to dismiss under Rule 12(b)(6).

Second, Ford asserts that Mickens's claim is out of time because the new car provisions of the Lemon Law "only apply to a 'nonconformity arising' within two years after purchase or during the first 24,000 miles of operation, whichever comes first." (Def. Mem. at 9 n.3 (citing N.J. Stat. Ann. § 56:12-31)). Again, I need not resolve this issue, but I note briefly that the two-year time limit governs a consumer's complaint to the manufacturer or dealer under section 56:12-31, not the manufacturer's report to the Division of Consumer Affairs under section 56:12-44. The two sections differ procedurally and substantively, and Section 44 does not refer to or incorporate Section 31. Each of these sections contains its own explicit time limitation, triggered by a distinct event. The manufacturer's or dealer's Section 31 obligation to repair arises from the *customer*'s report of a problem with a *particular* car within 2 years of 24,000 miles after *purchase*. The manufacturer's Section 44 obligation to report arises from the *manufacturer's* discovery of a *model-wide* defect, and the report must be made within one year after such *discovery*. In short, Sections 31 and 44 are distinct, and each is governed by its own time limitation.

Judge Wigenton, to whom this case was previously assigned, dismissed the Initial Complaint because it lacked the requisite allegations of causation. (Wigenton Op. at 7-8 [ECF No. 23]). In his brief opposing Ford's motion to dismiss the Initial Complaint, Mickens first suggested a theory of causation based on hypothetical remedial action by the Division of Consumer Affairs. In that brief, Mickens asserted that, in response to a Lemon Law Section 16 notification of the defect, the Division of Consumer Affairs "might" have taken remedial action and that he "might" not have purchased the car. Although not required to do so, Judge Wigenton considered and discussed the causation allegations in Mickens's brief. Her opinion placed Mickens on notice that such "might be" pleading was insufficient to establish a causal link, and granted leave to file an amended complaint within 30 days. (Wigenton Op. at 8-9 [ECF No. 23]). Now, in the Amended Complaint that is the subject of this motion, Mickens has swapped the word "would" for "might," and added some verbal elaboration. That change in phrasing is no substitute for facts that plausibly suggest the Division would have taken the posited remedial action and that, if it had, Mickens would not have purchased the Mustang.[5] The Court is convinced that a third complaint would not lead to a different outcome. *See Alston v. Parker*, 363 F.3d 229, 234-35 & nn. 7-8 (3d Cir. 2004) ("dismissals with prejudice may be appropriate … if the repleading does not remedy the Rule 8 violation") (citing *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703-04 (3d Cir.1996)).

As to Count I, the motion to dismiss is therefore **GRANTED**, and Count I is **DISMISSED WITH PREJUDICE**.

---

[5]     This court's analysis is directed to the face of the Complaint, as required by the standards governing Rule 12(b)(6). *See generally Iqbal*, 556 U.S. at 679 (assessment of plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). In an abundance of caution, however, the court has visited the Division of Consumer Affairs website in search of anything that might support the plausibility of the causation allegations or suggest that granting leave to amend the complaint a second time might be productive. The Lemon Law section of the website does not mention the Section 16 reporting requirement at issue here, nor does it announce any warranty extension or remedial measure of any kind in response to such a report. The site is chiefly devoted to giving consumers more general guidance about rules and procedures with respect to complaints about defects in the cars they own. It contains no lists of, or warnings to consumers about, any automobile defects reported pursuant to Section 16 of the Lemon Law. The only announcement about a specific automobile defect is a 2011 consumer alert that Toyota had recalled certain   models,   primarily   because   of   sticking   accelerator   pedals.   *See* www.njconsumeraffairs.gov/ocp/lemonlaw.htm; www.njconsumeraffairs.gov/ocp/auto.htm (last visited on Sept. 26, 2012).

### B. <u>Counts II and III: CFA/Material Omission and Deceptive Conduct</u>

Count II of the Complaint alleges that Ford failed to disclose the galvanic corrosion defect to consumers and that this omission was material for purposes of the CFA. Count III alleges that Ford engaged in deceptive conduct under the CFA; essentially, that it carved out from its five-year, unlimited-mile warranty the very type of damage most commonly caused by galvanic corrosion, relegating it to the more limited three-year/36,000 mile coverage. Ford has moved to dismiss (1) Count II because Ford disclosed the potential for galvanic corrosion through its warranty coverage and because the hood outperformed its warranty and (2) Count III because Mickens did not adequately plead deceptive conduct or misrepresentation. To the extent that these counts are fraud-based, Ford argues that they are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b); in any event, however, Ford argues that they should be dismissed. The Court holds that Ford's motion to dismiss Counts II and III should be denied.

#### 1. *Unlawful Conduct*

As noted above, a CFA count must plausibly allege the first element, unlawful conduct, in order to survive a motion to dismiss. *See* pp. 7-8, *supra*. The allegations of unlawful conduct in Count II and Count III meet this standard; I discuss them in order.

##### a. Mickens's Knowing Omission Claim (Count II) Adequately Alleges Unlawful Conduct Under the CFA

CFA "unlawful conduct," as noted above, may encompass a seller's omission of a material fact in connection with a sale of merchandise. An omission "occurs where the defendant (1) knowingly concealed (2) a material fact (3) with the intention that the consumer rely upon the concealment." *Arcand*, 673 F. Supp. 2d at 297. "[W]hen the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an element of the fraud." *Cox*, 138 N.J. at 18, 647 A.2d at 462. "Implicit in the showing of an omission is the underlying duty on the part of the defendant to disclose what he concealed to induce the purchase." *Arcand*, 673 F. Supp. 2d at 297. "Obviously, there can be no [unlawful conduct], or reliance for that matter, if the defendant was under no obligation to disclose the information in the first place." *Id.* Unlike affirmative acts or misrepresentations, actionable omissions have intent as a required element. *Cox*, 138 N.J. at 17, 647 A.2d at 462.

Mickens alleges that Ford knowingly concealed the galvanic corrosion defect from Mickens and the class members with the intent that they rely on the absence of such information when purchasing the affected vehicles. (*Id.* ¶¶ 85, 113). Ford responds that (1) its warranties disclosed the potential for a

galvanic corrosion defect, and (2) Ford's failure to advise Mickens that the hood might require repair *after* the warranty period is not actionable. (Def. Mem. at 16-17; Def. Reply Mem. at 7-10). The Court finds Ford's arguments unavailing.

        i.    Warranty Coverage of a Potential Defect Does Not Negate a Knowing Omission Claim under the CFA

Ford notes that the three- and five-year warranties offered in connection with the purchase of its vehicles "expressly refer to corrosion damage." This, according to Ford, is tantamount to disclosure of the potential for galvanic corrosion, so Ford cannot be faulted for knowingly concealing that defect. (Def. Mem. at 16). The case law, the wording of the CFA and the policy behind the statute fail to establish that proposition. Warranty coverage of a particular problem does not, as a matter of law, negate a CFA claim that the manufacturer knowingly omitted information about a design defect.

Mickens alleges a knowing omission under the CFA in connection with the vehicle warranty. Case law has defined the contours of such a claim:

> In cases . . . where an allegedly-defective product was covered by a warranty, [a] claim that a defect may, but has not, manifested itself until after the expiration of the warranty period cannot form the basis of a claim under the CFA. Rather, a plaintiff must sufficiently allege that the defendant manufacturer *knew with certainty* that the product at issue or one of its components was going to fail.

*Tatum v. Chrysler Group, LLC*, 2011 U.S. Dist. LEXIS 32362, *16 (D.N.J. March 28, 2011) (emphasis in original) (citing *Perkins v. Daimler Chrysler Corp.*, 383 N.J. Super. 99, 11-12, 890 A.2d 997, 1004 (App. Div. 2006)); *see also Maniscalco v. Brother Int'l Corp.*, 627 F. Supp. 2d 494, 501-02 (D.N.J. 2009).

The Complaint adequately alleges such a claim. Mickens alleges in detail the process by which Ford decided to replace its iron hood panels with aluminum ones. (AC ¶¶ 15-25, 88 [ECF No. 25]). Because aluminum was in contact with iron parts in the presence of an electrical current, galvanic corrosion was certain to occur in all of these vehicles. (*Id.* ¶¶ 28-31, 67, 88). The Complaint notes that this design change applied to all fourteen of the subject vehicle models. (*Id.* ¶¶ 24, 66, 88). Ford therefore knew that galvanic corrosion would occur to all of the vehicles, including Mickens's 2006 Mustang, that had the new aluminum hood panels. (*Id.* ¶¶ 31-34, 68-70, 86, 88, 120).

None of the cases cited by Ford support its claim that warranty coverage of a particular defect negates a knowing-omission claim under the CFA. *In re Ford Motor Co. Ignition Switch Products Liability Lit.*, No. 1112, 1999 WL 33495352 (D.N.J. May 14, 1999) was a multidistrict litigation over an alleged defective ignition switch that caused overheating and fires in Ford vehicles. *Id.* at *3. None of the plaintiffs were from New Jersey and the CFA was not

implicated. *Id.* at \*5 n.7. The plaintiffs also claimed that the express warranty constituted an actionable "representation" by the manufacturer that the vehicle was defect-free when sold. *Id.* at \*6. That differs from Mickens's claim here that Ford knowingly omitted to disclose a known defect. It also is seemingly in tension with Ford's position here that warranty coverage of a potential defect constitutes *disclosure* of that potential defect. *Neuser v. Carrier Corp.*, No. 06-C-645-S, 2007 WL 484779 (W.D. Wis. Feb. 9, 2007) and *Ball v. Sony Elecs., Inc.*, No. 05-C-307-S, 2005 WL 2406145 (W.D. Wis. Sept. 28, 2005), included similar claims that a warranty served as an affirmative misrepresentation for the purposes of the Wisconsin consumer fraud statute. Similarly unavailing is *Herbstman v. Eastman Kodak Co.*, 68 N.J. 1, 342 A.2d 181 (1975), which discussed whether an express warranty extended implied warranties of merchantability and fitness to defects that arose within the warranty period. Mickens is not claiming that here. *See also Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 501 (D.N.J. 2009) (noting that a defense to a CFA claim is that a product performed beyond its warranty period, but denying motion to dismiss a CFA claim based on allegations that the manufacturer knew the part would fail, and it did fail, prematurely) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 11-12, 890 A.2d 997 (App. Div. 2006)).

Moreover, adopting Ford's position that the mention in a warranty of a potential defect negates any claim of a knowing omission under the CFA would undermine the statute's strong remedial purpose. "In New Jersey, broad CFA protection was envisioned by the legislature and has been recognized by the Supreme Court of New Jersey." *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 502 (D.N.J. 2009) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 604, 691 A.2d 350, 364 (1997) ("[t]he history of the [CFA] is one of constant expansion of consumer protection ..."); *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 264, 696 A.2d 546, 551 (1997) ("[t]he language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud."). It is, at least, a bit odd to treat a warranty against the occurrence of a defect as a disclosure to the consumer that the defect can or will occur. Indeed, many consumers might interpret such a warranty as an assurance that the defect is *not* likely to occur. In advertisements, manufacturers often boast of their ironclad warranties and present them to the consumer as emblems of product quality and reliability. Moreover, Ford's interpretation would create a perverse incentive. Manufacturers would insert into warranties long lists of potential defects, and thereby – in the guise of reassuring consumers that they are covered against all eventualities – protect themselves, even from claims that they had actual knowledge of a material defect and concealed it, intending that consumers rely.

I do not, of course, prejudge the merits of the dispute. But at the motion-to-dismiss stage, I cannot say that the courts of New Jersey would hold

16

generically, as a matter of law, that a warranty covering a potential defect precludes a material-omission claim under the CFA that the defendant knowingly concealed that defect.

ii.   The Aluminum Hood Panel Manifested the Galvanic Corrosion Defect During the Warranty Period

"New Jersey allows a CFA defense in circumstances where a warranty exists and the product performs beyond that warranty period." *Maniscalco v. Brother Int'l Corp. (USA),* 627 F. Supp. 2d 494, 501 (D.N.J. 2009) (citing *Perkins v. DaimlerChrysler Corp.,* 383 N.J. Super. 99, 111-12, 890 A.2d 997, 1004 (App. Div. 2006)). In such an instance, "the failure of a manufacturer or seller to advise a purchaser that a part of a vehicle may breakdown or require repair after the expiration of the warranty period cannot constitute a violation of the CFA." *Id.* That principle, however, is not without limits. The plaintiff may nevertheless state a claim by alleging that the purported defect manifested itself within the warranty period and that the manufacturer knew the product would fail. *See id.; Maniscalco,* 627 F. Supp. 2d at 501.

Mickens has adequately alleged that the galvanic corrosion defect arose during the warranty period, and that Ford knew this would occur. He states that he purchased the car on September 29, 2005. (AC ¶ 47 [ECF No. 25]). As part of this transaction, Mickens received a three-year or 36,000 mile "Bumper-to-Bumper" warranty and a five-year, unlimited mileage limited warranty. (*Id.* ¶ 48). The five-year, unlimited mileage warranty covered corrosion damage that perforated a body panel. (*Id.* ¶ 36). Other, *i.e.* non-perforative, corrosion damage was covered only by the three-year warranty. (*Id.*). In June 2008, within three years and 36,000 miles of buying the car, Mickens observed galvanic corrosion on the hood of his car. (*Id.* ¶ 49). Mickens took his car to the dealership where he bought it to have the damage fixed. (*Id.*). Pursuant to Ford's instructions, the dealership performed a "sand and paint" repair that served as a cosmetic fix while leaving the underlying galvanic corrosion defect unchanged. (*Id.*). Accordingly, galvanic corrosion resumed and continued, even after Mickens again brought his car to the dealership for repairs. (*See id.* ¶¶ 49, 57, 96, 112-13; *see also id.* ¶¶ 27, 29).

These detailed allegations are distinguishable from cases in which the plaintiffs did not allege that the defect occurred within the warranty period. In *Glass v. BMW of North America, LLC,* the defect in the power steering system was not alleged to have occurred until after the warranty period had passed. No. 10-5259, 2011 WL 6887721, at *10 (D.N.J. Dec. 29, 2011). In *Noble v. Porsche Cars of N. Am.,* the defect in a used Porsche's water-cooled car engine did not arise within the terms of the four-year new car warranty. 694 F. Supp. 2d 333, 338 (D.N.J. 2010). At least as distinguishable is *Perkins v. DaimlerChrysler Corp.,* 383 N.J. Super. 99, 890 A.2d 997, 1004 (App. Div. 2006), in which it "was not alleged that the exhaust manifold has even actually

17

required repair or replacement . . . ." *See also Duffy v. Samsung Elecs. Am., Inc.*, No. CIV.06-5259, 2007 WL 703197, at *8 (D.N.J. Mar. 2, 2007) ("[P]laintiff's microwave continued to perform beyond the period in which Samsung was contractually bound to repair or replace any defective part . . . ."); *Alban v. BMW of N. Am., LLC*, No. 09-5398, 2011 WL 900114 (D.N.J. Mar. 15, 2011) (plaintiff's car trunk developed an odor approximately one year after the expiration of a 48 month or 50,000 mile warranty).[6]

Mickens has also plausibly pleaded facts suggesting Ford's knowledge. Ford necessarily was aware:

> that it had changed the design of the subject vehicles to incorporate a new aluminum hood panel; that it had retained the old iron-based connecting and supporting parts while failing to provide an adequate coating between the subject vehicles' aluminum and iron parts, alter the flow of electrical current across the new aluminum hood panel or incorporate a sacrificial anode into the new hood design; that the aluminum hood panel design change **would give rise to galvanic coupling and invariably cause galvanic corrosion of the aluminum hood** . . . .

(AC ¶ 88 [ECF No. 25]) (emphasis added). Mickens explains that Ford had to know that galvanic corrosion would occur based upon commonly known scientific principles, as well as Ford's prior experience with galvanic corrosion, its participation in numerous studies, and its access to "extensive technical and scientific information relating to galvanic corrosion to inform its vehicle design decisions, including its choice of materials." (*Id.* ¶¶ 31-35). These allegations provide a plausible basis for an inference that Ford knew galvanic corrosion would occur in the aluminum hood panels.

In short, the Complaint adequately pleads the CFA unlawful conduct element as to Count II.

### b. Count III Alleges Deceptive Conduct, an Affirmative Act under the CFA

The Court now turns to the unlawful conduct element in Count III, which can be disposed of more briefly.

---

[6]      Mickens's detailed allegations also differ from those in *Nobile v. Ford Motor Co.*, No. 10-1890, 2011 WL 900119 (D.N.J. Mar. 14, 2011). The *Nobile* plaintiffs did not allege, among other things, the nature of the transmission defect, when it occurred, or the date they purchased their vehicle. 2011 WL 900119, at *1 n.1. By contrast, as noted above, the Complaint discusses the process by which Ford designed the defected hood panels and how and when Mickens's car suffered from the defect.

A threshold issue is whether Ford's alleged unlawful conduct in Count III consisted of deceptive conduct, misrepresentations, or both.[7] *See Glass v. BMW of North America, LLC*, No. 10-5259, 2011 WL 6887721, at *5 (D.N.J. Dec. 29, 2011). Mickens states that Count III is based on Ford's "implementation of a deceptive warranty scheme for the subject vehicles." (Pl. Opp. Mem. at 13). Ford contends that Count III, viewed as a misrepresentation or omission claim, must be dismissed, particularly in light of the heightened pleading standard of Federal Rule of Civil Procedure 9(b). (Def. Mem. at 18). Mickens counters that Count III, although entitled "Deceptive conduct/Misrepresentation," alleges only deceptive conduct, and as such is pleaded with sufficient particularity.

It is true that CFA defines unlawful conduct to include both "deception" and "misrepresentation." N.J. Stat. Ann. § 56:8-2. For purposes of this motion, however, it does not matter which is the baby, and which the bathwater; the point is that they are distinct. Each is but one item in the "disjunctive" list of prohibited practices in the CFA. *See Cox*, 138 N.J. at 19, 647 A.2d at 462. Each is independently actionable under the CFA, and if at least one of them is adequately alleged, Count III survives.

Count III, despite its double-barreled title, does seem to plead only deceptive conduct. The count is introduced with the words "Defendant engaged in deceptive conduct ..." (Compl. ¶ 105 [ECF No. 25 at 29]), and the rest of the count describes an alleged manipulation of the warranty scheme (*see id.* ¶¶ 106-120). Mickens himself disclaims any reliance on false statements as such. *See* Pl. Opp. Mem. at 12 ("the purpose of Count III . . . is to challenge the deceptive conduct underlying Defendant's deceptive warranty coverage scheme for the subject vehicles, not to challenge the truth of a specific statement Defendant made in carrying out that scheme.") At any rate, Count III fails to identify any specific misrepresentations or omissions.[8]

Count III may, however, proceed as a "deception" under the CFA. Count III sufficiently alleges a deceptive course of conduct Count III alleges in detail Ford's deceptive conduct in creating the galvanic corrosion defect and devising a warranty plan whereby it avoided responsibility for fixing the problem by (1) excluding the type of damage typically caused by galvanic corrosion from the longer, five-year warranty and (2) performing only cosmetic repairs during the shorter warranty period, lulling the car owner into losing the major benefit of corrosion coverage. (AC ¶¶ 106-113 [ECF No. 25]). The Complaint includes the general dates when the design change was made, the years when Ford included

---

[7]   Ford's briefs state that to the extent Count III is based on a knowing omission, its arguments for dismissal of Count II apply here as well. Because the Court finds that Count III alleges an affirmative act, *see infra,* the point is moot.

[8]   To the extent Count III alleged fraudulent statements or omissions, it might be subject to analysis under Fed. R. Civ. P. 9(b), as well as the substantive legal defenses asserted with respect to Count II. For the reasons stated herein, however, Count III survives on a fraudulent-acts theory.

the defective hood panels in its vehicles, and the two repair memos Ford sent to dealerships regarding repair of the defect. (*Id.* ¶¶ 21-22, 31, 38-42). This puts Ford on notice of the precise misconduct alleged against it so as to allow Ford to respond accordingly. *See Strzakowlski v. GMC*, No. 04-4740, 2005 U.S. Dist. LEXIS 18111, at *20 (D.N.J. Aug. 16, 2005) (citing *Seville Indus. Machry. Corp. v. Southmost Machry. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)) (finding complaint sufficiently precise because it included the specific conduct and omissions constituting fraud, the years the defective cars were sold, and the date that defendant had initiated a program to ostensibly address the defect).

Accordingly, the court finds that Count III, like Count II, sufficiently alleges unlawful conduct under the CFA. This is not to say, of course, that such a claim would necessarily prevail; the allegations, however, are sufficient to require an answer.

## 2. *Ascertainable Loss*

Counts II and III also sufficiently allege the second, ascertainable-loss element of a CFA claim.

To survive a motion to dismiss for failure to state a claim arising under the CFA, a complaint must sufficiently allege an ascertainable loss. *See* p. 8, *supra*. The plaintiff need not, however, plead ascertainable loss with pinpoint specificity. *See Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 503 (D.N.J. 2009) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111, 890 A.2d 997, 1003-04 (App. Div. 2006)) ("Here, plaintiff alleged in her complaint that she suffered an ascertainable loss. She did not allege the nature of that loss, nor was she so required at that stage. Defendant's motion to dismiss, unlike the summary judgment procedure, did not require, in order to avoid dismissal, that the plaintiff provide evidential material to rebut defendant's contention that she had not sustained ascertainable loss . . . ."); *Lamont v. OPTA Corp.*, 2006 WL 1669019 (N.J. Super. Ct. App. Div. 2006) ("There is nothing in *Thiedemann* that requires the pleading of an ascertainable loss element of a Consumer Fraud Act cause of action with any special specificity . . . ."). Even in opposition to a motion for summary judgment, "[a]n estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss." *Thiedemann*, 183 N.J. at 249, 872 A.2d at 793 (internal quotation and citation omitted). At the motion to dismiss stage, alleging diminution in value due to the defect is sufficient. *Maniscalco*, 627 F. Supp. 2d at 503 (finding that conclusory statement about the replacement cost of a defective machine was an adequate allegation of ascertainable loss); *Strzakowlski v. GMC*, No. 04-4740, 2005 U.S. Dist. LEXIS 18111, at *22-24 (D.N.J. Aug. 16, 2005) (alleging diminution in value satisfies the CFA's loss requirement); *cf. Perkins*, 383 N.J. Super. at 110-11, 890 A.2d at 1003.

20

Mickens has alleged an ascertainable loss by including (1) the cost of replacing the hood, which continued to suffer from galvanic corrosion before and after he had it cosmetically fixed under warranty by the dealership and (2) the amount he paid to rent a car while his car was at the dealership for repairs. (AC ¶¶ 58, 99, 116 [ECF No. 25]). Mickens also claims that the value of his vehicle is diminished by the galvanic corrosion. (*Id.* ¶¶ 59, 99, 116). Those allegations are legally sufficient under *Perkins* and *Maniscalco*, and they meet federal pleading standards.

### 3. *The Complaint Adequately Alleges a Causal Relationship Between Defendant's Misconduct and Plaintiff's Loss*

Counts II and III also adequately plead causation, the third and final element of a CFA claim. "To survive a motion to dismiss . . . it is sufficient if a plaintiff avers that had the alleged defect been disclosed, consumers would not have purchased defendant's product." *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 503 (D.N.J. 2009) (citing *McCalley v. Samsung Elecs. Am., Inc.*, No. 07-2141, 2008 WL 878402, at *9, 2008 U.S. Dist. LEXIS 28076, at *26 (D.N.J.2008); *see also Strzakowlski v. GMC*, No. 04-4740, 2005 U.S. Dist. LEXIS 18111, at *25 (D.N.J. Aug. 16, 2005) (plaintiff adequately alleged a CFA claim where plaintiff claimed that she would not have purchased her vehicle if GM had disclosed the defect at issue)).

Mickens alleges that he was not aware of the galvanic corrosion defect prior to purchase and would not have purchased the car were it not for Ford's failure to disclose the existence of the defect. (AC ¶¶ 101, 118 [ECF No. 25]). These causation allegations are statements by Mickens about his own knowledge and intent, facts within his control. They do not share the infirmity of the causation allegations in Count I, which required speculation about intervening actions that the Division of Consumer Affairs would have taken if Ford had reported the defect, and the actions Mickens and other consumers would have taken as a result.

The Plaintiff has alleged facts within his knowledge, which, if true, could form the basis of a causal nexus. The element of causation is adequately pleaded as to Counts II and III.

Accordingly, the motion to dismiss is denied as to Counts II and III.

## IV.   CONCLUSION

For the reasons stated above, the Defendant's motion to dismiss is **GRANTED** in part and **DENIED** in part. The motion to dismiss is granted with respect to Count I, which is dismissed with prejudice. The motion to dismiss is denied with respect to Counts II and III. An appropriate order follows.

KEVIN MCNULTY, U.S.D.J.

Date: October 1, 2012