## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WILLIAM MICKENS and MARK SOLOMON**, individually and on behalf of all others similarly situated,<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**FORD MOTOR COMPANY,**<br><br>       **Defendant.** | Civ. No. 10-cv-5842 (KM)(MAH)<br><br><br>**OPINION** |

### KEVIN MCNULTY, U.S.D.J.:

The Ford Mustang, in production for over fifty years,[1] is a fabled[2] and popular[3] automobile—and it seems to evoke strong feelings in its devotees.[4] Two disappointed buyers, Williams Mickens (a self-described "Mustang guy")

---

[1] The Mustang was unveiled at the 1964 New York World's Fair. *Mustang Milestones*, Ford Motor Co. (Aug. 13, 2013), https://media.ford.com/content/fordmedia/fna/us/en/news/2013/08/13/mustang-milestones.html (timeline of Mustang events).

[2] Almost immediately, it earned a place in popular culture. *See, e.g.,* Wilson Pickett, *Mustang Sally, on* The Wicked Pickett (Atlantic, 1966); *Mustang Sally by Wilson Pickett*, Songfacts, www.songfacts.com/detail.php?id=5798 (last visited Sept. 9, 2015) (In this, the classic version of the song, an R&B singer laments that the recipient of his gift of a 1965 Mustang is ungrateful and unworthy.); *Bullitt* (Warner Bros. 1968); Trivia for *Bullitt (1968)* www.imdb.com/title/tt0062765/trivia?ref_=tt_trv_trv (last visited Sept. 9, 2015) (This film contains a harrowing chase scene through the streets of San Francisco, in which the hero, played by Steve McQueen, drives a 1968 Ford Mustang 390 GT 2+2 fastback.).

[3] Bradford Wernle, *Ford Mustang Repolished for 2015 with Global Ambitions*, Automotive Daily (Dec. 5, 2013 12:01 AM), www.autonews.com/article/20131205/OEM04/131209932/ford-mustang-repolished-for-2015-with-global-ambitions (chart of historical sales figures).

[4] *See generally* The Mustang Source, *passim*, http://themustangsource.com (last visited Sept. 9, 2015).

and Mark Solomon, bring this action alleging that the defendant, Ford Motor Company, knowingly sold them Mustang automobiles with a design defect that exposed the aluminum hoods to galvanic corrosion, marring the hoods' appearance.[5] The plaintiffs do not assert breach of warranty, a claim that might well have a basis. Rather, they claim—individually and on behalf of a putative class of Mustang owners—that Ford engaged in unlawful and deceptive practices in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.* ("CFA"). The issue, then, is not whether the cars' hoods were defect-free; the issue (to simplify a bit) is whether Ford has committed consumer fraud under the CFA by concealing or evading responsibility for a design flaw.

Now before the Court is Ford's motion for summary judgment. Even plaintiffs impliedly concede that the galvanic corrosion theory has fallen apart. Just as fatal to the plaintiff's case, however, is their failure to establish any ascertainable loss. For the reasons set forth below, then, the motion is granted.

## I.    BACKGROUND

Mickens

Plaintiff William Mickens has owned several Mustangs. (Defendant's Statement of Material Facts ("Def. Facts"), Dkt. No. 86-3, ¶1) On September 29, 2005, Mickens purchased a new 2006 Mustang GT for $29,350 from Fette Ford in Clifton, New Jersey. (*Id.* at ¶¶5, 7) That price included Ford's New Vehicle Limited Warranty, which provided "Bumper to Bumper" coverage for three years or 36,000 miles, whichever came first. (*Id.* at ¶8) Ford also provided "Corrosion Protection" coverage for five years and unlimited miles for

---

5       A long hood (and correspondingly short rear deck) is a prominent, iconic feature of the Mustang and, to some extent, of the "pony car" genre that it spawned. *See* Wikipedia, *Pony Car*, nn.7-13 and accompanying text, https://en.wikipedia.org/wiki/Pony_car (last visited Sept. 9, 2015).

perforations in the car's body sheet metal panels due to manufacturing defect or worker error. (*Id.* at ¶9)

On March 25, 2008, Mickens took the car back to Fette Ford because he observed "paint bubbling on the hood." (*Id.* at ¶16) The bubbling, Mickens said, resembled "little pinholes" on the passenger side along the front ridge of the hood, along with white corrosion "underneath the hood in the seam." (*Id.*) Because Fette Ford does not have a body shop, it sent the car to Roscoe's Auto Body for the necessary repairs. (*Id.* at ¶17) The repairs were paid for under the warranty. After the repairs were completed, the car "looked good." (Deposition of William Mickens ("Mickens Dep."), Dkt. No. 86-33, 139:11-14)

Approximately three months after the hood was repaired, however, Mickens again noticed "bubbles" and other signs of corrosion. (Plaintiff's Statement of Material Facts ("Pl. Facts"), Dkt. No. 88, ¶D18) Around March 2009, Mickens brought the car back to Fette Ford. (Def. Facts, ¶18) The hood was again repaired under warranty at an independent body shop. (It is unclear whether this was the same shop that performed the first repair.) (*Id.* at ¶18) This time, however, Mickens was immediately displeased with the work; he says it was "a lousy job." (Mickens Dep., 140:19-21) Mickens complained about "crimp marks" in the paint which, he says, "ruined the uniformity of the band on the front of the hood" and made it look "dented in." (Mickens Dep., 141:20-142:16) Mickens returned the car to Fette Ford "about five or six times" to have the damage repaired. (Def. Facts, ¶19) Each of the subsequent repairs was covered by the warranty or provided at no cost to Mickens. (*Id*; *see also* Mickens Dep., 166:21-23, 198:11-15) All of these repairs, in Mickens's opinion, were unsatisfactory.

On November 16, 2009, Mickens contacted Ford's Customer Relationship Center about the problem with the hood. (Def. Facts, ¶20) Ford initially agreed to "provide assistance." Later, however, Ford backtracked: because the three year warranty on Mickens's Mustang had expired, Ford said, there was nothing more it could do. (*Id.*; *see also* Pl. Facts, ¶D20)

3

In June 2010, Mickens asked two independent body shops for estimates to repair the hood to his satisfaction. (Def. Facts, ¶21) Both stated that because the previous repairs were improperly done, Mickens would have to purchase an entirely new hood. (*Id.*) Mickens decided he would not replace the hood. (*Id.*)

In November 2010, Mickens commenced this action as the sole named plaintiff. (An account of the procedural history is below.)

On March 18, 2011, Mickens traded in his 2006 Mustang for a used 2011 Mustang GT 5.0. (*Id.* at ¶23) Route 23 Automall, a Ford dealer in Butler, New Jersey, credited Mickens with $17,000 for the trade-in. (*Id.*) Mickens testified that his experience with corrosion on the 2006 Mustang did not deter him "because [he] like[d] the [new] car." Mickens has not experienced any hood corrosion problems with his 2011 Mustang. (*Id.* at ¶26)

Solomon

On May 31, 2011, plaintiff Mark Solomon purchased a new 2011-model Mustang GT from All American Ford, a dealership located in Old Bridge, New Jersey. (*Id.* at ¶¶30-31) The parties disagree on how much Solomon paid—Ford says $46,508.45; Solomon, $47,833. (*See* Pl. Facts, ¶D32) The purchase price included a three year/36,000 mile "Bumper to Bumper" warranty, and a five year/unlimited mile "Corrosion Protection" warranty. (Def. Facts, ¶35)

In the summer or fall of 2012, Solomon first noticed that the paint on the lip of hood was "bubbling." (*Id.* at ¶42) He did not contact Ford or have the car examined because the damage "was small." (*Id.*) In early 2013, the paint began chipping on the interior of the hood. On March 18, 2013, Solomon brought his Mustang to All American Ford to address the damage to the hood. (*Id.* at ¶41) Although he was told that that Ford would fix the hood under warranty, Solomon declined the repair. (*Id.* at ¶¶43-44)

Solomon says he refused because he had researched Ford's standard method for repairing corrosion on the Mustang's aluminum hood and believed it to be unsatisfactory. According to Solomon, that method—which involved

4

sanding and repainting the affected area—"was not going to fix the problem." (Deposition of Mark Solomon ("Solomon Dep."), Dkt. No. 88-9, 185:11-13) Solomon also testified that he had read online about Mickens's lawsuit, from which he concluded that the only lasting solution would be to replace the hood entirely. (Solomon Dep., 185-87) If he accepted the warranty repair, Solomon believed, "the same problem was just going to happen again." (*Id.* at 186:12-191:13) Solomon suggested that Ford either (a) replace his hood or (b) allow him to purchase an aftermarket hood made of carbon fiber and pay for painting that hood. (Pl. Facts, ¶D44) After conferring with Ford, the local dealership refused, but renewed its offer to repair the hood at no charge. (*Id.* at ¶¶D44-45)

On March 27, 2013, Solomon purchased an aftermarket hood made of carbon fiber and installed it on his car. (Def. Facts, ¶45)

The Current Action

Mickens commenced this action against Ford on November 10, 2010, alleging that the hood of his 2006-model Mustang had sustained galvanic corrosion. (Dkt. No. 1) Galvanic corrosion is "a process by which two metals with different electrode potentials come into contact in the presence of electricity." (Dkt. No. 1, ¶9) That contact, called galvanic coupling, "causes the more active metal (the anode) to give its electrons up to the less active metal (the cathode), resulting in the accelerated corrosion of the anodic metal." (Dkt. No. 1, ¶9) The Complaint asserted claims for unjust enrichment and violations of the CFA. Mickens sought to represent a putative class of all current owners or lessees who purchased or leased 14 different models of Ford, Lincoln, and Mercury vehicles between 2000 and 2007. (Dkt. No. 1, ¶54) On January 28, 2011, Ford moved to dismiss both claims. Mickens voluntarily dismissed the unjust enrichment claim and District Judge Wigenton, to whom the case was then assigned, dismissed the CFA claim on August 5, 2011, granting leave to amend the complaint. (Dkt. No. 23)

Mickens filed an Amended Complaint ("AC") (Dkt. No. 25) on September 7, 2011. The AC alleged that Ford knowingly manufactured the vehicles with a

5

design defect that caused galvanic corrosion. Mickens asserted CFA claims based on a violation of the New Jersey Lemon Law, N.J.S.A. 56:12-44, fraudulent omission, and deceptive conduct. On October 26, 2011, Ford again moved to dismiss. (Dkt. No. 28)

On August 1, 2012, this case was reassigned to me. On October 1, 2012, I granted in part and denied in part Ford's motion to dismiss. I dismissed the CFA claim based on the Lemon Law with prejudice, but held that Mickens had successfully pleaded CFA claims for fraudulent omission and deceptive conduct. (Dkt. No. 43)

On September 4, 2013, Mickens filed a Second Amended Complaint ("2AC") that added Solomon as a plaintiff. (Dkt. No. 66) The 2AC amended the class definition to include only those who had purchased new Mustangs in New Jersey between 2000 and 2012.

The 2AC alleges that in order to bring its 2000-model vehicles into compliance with Corporate Average Fuel Efficiency (CAFE) standards, Ford switched to aluminum hoods to save weight. (*Id.* at ¶¶23-24) The 2AC states that Ford then continued to employ the aluminum hood panel design in the subject vehicles through 2011. (*Id.* at ¶24) The defect inherent in this design, according to the 2AC, is that it failed to change the iron-based parts that connect to and support the now-aluminum hood. Combined with the flow of electrical current through the hood, this had a bad effect. (*Id.* at ¶27) The plaintiffs allege that this design change "caused all of the subject vehicles to experience a problem that [Ford] should have anticipated: the occurrence of galvanic corrosion."[6] (*Id.* at ¶28)

The 2AC alleges that although Ford had prior knowledge of the likelihood of galvanic corrosion, it nonetheless adopted the aluminum hood design without adopting additional changes to deter or prevent such corrosion. (*Id.* at ¶37) Such changes, the plaintiffs say, would have included "adding more

---

[6]     The description of galvanic corrosion in the 2AC is identical to the description provided in the original Complaint. (*Compare* Dkt. No. 66 ¶29 *with* Dkt. No. 1 ¶9)

aluminum parts to the subject vehicles, applying a protective coating to the new hood panels or designing a new electrical system that would alter the path of electrical current through or across the new hood panels." (*Id.*) The plaintiffs allege that Ford deliberately failed to implement those changes because they were too expensive and threatened to delay the subject vehicles' compliance with CAFE standards. (*Id.*)

At the same time, the plaintiffs allege, Ford intentionally crafted the vehicles' warranties to limit its exposure to galvanic corrosion claims. (*Id.* at ¶38) They maintain that Ford's five year/unlimited mile "Corrosion Protection" only applies to "corrosion that perforates body panels," and therefore does not cover galvanic corrosion, which typically does not perforate body panels. (*Id.*) As a result, the plaintiffs say, claims for galvanic corrosion are relegated to the more limited coverage provided by the three year/36,000 mile "Bumper to Bumper" warranty. (*Id.*) Outside the warranty period, the cost of repairing corrosion would be borne by the owner, not Ford.

Based on these facts, Count I of the 2AC alleges that Ford violated the CFA by knowingly omitting material information about the galvanic corrosion defect from the information it gave the plaintiffs (and putative class members). Count II alleges that Ford violated the CFA by deliberately designing the applicable warranties to evade its exposure to claims for galvanic corrosion.

Now before the Court is Ford's motion for summary judgment. (Dkt. No. 90)

## II.   JURISDICTION

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

## IV.   ANALYSIS

### A. Elements of a CFA Claim

The plaintiffs' causes of action arise under the New Jersey CFA. In a diversity case this court must interpret substantive state law in accordance with rulings of the state's highest court. Lacking such specific guidance, it must predict how the state court would resolve the issue. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 220–21 (3d Cir. 2008); *Norfolk Southern Ry. Co. v. Basell*

8

*USA Inc.*, 512 F.3d 86, 91–92 (3d Cir. 2008); *see generally Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

The New Jersey Legislature enacted the CFA in 1960 to address fraudulent practices in the market for consumer goods and to deter such conduct by merchants. *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 11 (2004) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 21 (1994)). The CFA initially conferred enforcement power exclusively on the attorney general. *See Weinberg v. Sprint Corp.*, 173 N.J. 233, 247-48 (2002). In 1971, the CFA was amended to add a private right of action for consumers who have suffered from unconscionable or fraudulent practices in the marketplace. *See* N.J.S.A. 56:8-19. As amended, the statute provides:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act of the act hereby amended and supplement may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

*Id.* The CFA is to be liberally construed in favor of the consumer, *see Cox,* 138 N.J. at 14, and "applied broadly in order to accomplish its remedial purpose," *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) (quoting *Lemelledo v. Beneficial Mgmt. Corp.*, 150 N.J. 255, 264 (1997)). Accordingly, the trend under CFA has been one of "constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 604 (1997).

"To state a *prima facie* case under the CFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Payan v. GreenPoint Mortgage*

*Funding*, 681 F. Supp. 2d 564, 572 (D.N.J. 2010) (citing *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009)); *accord Gonzalez*, 207 N.J. at 576. The viability of CFA claim, however, "often turns on the question of whether a plaintiff is able to provide sufficient evidence of an ascertainable loss." *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 105 (App. Div. 2006).

The first element of a CFA claim—unlawful conduct—is defined as: "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise...." N.J.S.A. § 56:8-2. From this statutory definition, courts have derived three broad categories of unlawful conduct: affirmative acts, knowing omissions, and regulatory violations. *Federico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Cox*, 138 N.J. at 17). This case concerns actions that allegedly fall under the first two categories: affirmative acts and knowing omissions. The CFA deliberately leaves the definition of such unlawful conduct open-ended to ensure that its remedial power is not unduly confined to a predetermined set of prohibited practices. *See Gonzalez*, 207 N.J. at 576. The statutory scheme does, however, require distinct showings for claims based on acts and those based on omissions. "When the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act." *Cox*, 138 N.J. at 17. By contrast, "when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud." *Id.* at 18. An actionable omission thus occurs where the defendant "(1) knowingly concealed (2) a material fact (3) with the intention that the consumer rely upon the concealment." *Arcand v. Brother Intern. Corp.*, 673 F. Supp. 2d 282, 297 (D.N.J. 2009).

The second element—ascertainable loss—is central to Ford's summary judgment motion. The CFA provides for recovery of treble damages, reasonable

attorneys' fees, and costs by "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act...." N.J.S.A. § 56:8–19. An ascertainable loss occurs "when a consumer receives less than what was promised." *Union Ink Co. v. AT&T Corp.*, 352 N.J. Super. 617, 646 (App. Div. 2002). That said, the loss of the benefit of the bargain, by itself, is insufficient to demonstrate the kind of harm compensable under the CFA. "The certainty implicit in the concept of ascertainable loss is that it is quantifiable or measurable." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 248 (2005). Although the plaintiff need not have sustained an actual out-of-pocket loss,[7] he must proffer evidence of loss that is not hypothetical or illusory. *Id.* "An estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss." *Id.* The quantum of proof necessary to establish ascertainable loss may be provided through expert testimony, provided that such testimony is of "sufficient precision to withstand a motion for summary judgment." *Id.* at 249. In any event, "by the time of a summary judgment motion, it is the plaintiff's obligation to be able to make such a demonstration or risk dismissal of the case." *Id.*

The third element—causation—requires "that a causal relationship be established between any ascertainable loss and the unlawful practice condemned." *Ramanadham v. New Jersey Mfrs. Ins. Co.*, 188 N.J. Super. 30, 33 (App. Div. 1982) (claims based on substandard and delayed auto repairs). The claimed loss must have occurred "as a result of" the unlawful conduct under the CFA. N.J.S.A. § 56:8–19. The plaintiff must therefore allege and prove that he has "'suffer[ed] a loss due to' an unlawful practice." *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 473 (1988) (quoting *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 271 (1978)). In other words, the plaintiff must show that unlawful conduct proximately caused his loss. *Id.* (stating that

---

[7]     *See, e.g., Cox*, 138 N.J. at 22-23 (noting that to demonstrate "loss," the plaintiff need not have actually spent money to perform repairs to correct the defendant's errors in performing a kitchen renovation).

a plaintiff's loss must be "particularly proximate to a misrepresentation or unlawful act of the defendant condemned by the [CFA]"). Thus, for example, a plaintiff who asserted that a dealership unfairly denied his application to lease a new car had no claim under the CFA for expenses he incurred when his old car broke down a month later. *Feinberg v. Red Bank Volvo, Inc.*, 331 N.J. Super. 506, 511, 752 (App. Div. 2000). The connection between the alleged violation and the loss was too indirect to satisfy the proximate cause requirement.

## B. The Plaintiff's CFA Claims

### 1. Count I – Knowing Omissions

The plaintiffs' omissions claim, as noted above, requires a showing that Ford knowingly concealed a material fact with the intention that the consumer rely on that omission. *See Arcand*, 673 F. Supp. 2d at 297. Implicit is the requirement that the defendant be subject to an "underlying duty…to disclose what he concealed to induce purchase." *Id.* "Obviously, there can be no [unlawful conduct], or reliance for that matter, if the defendant was under no obligation to disclose the information in the first place." *Id.* Whether the defendants were subject to a duty to disclose is a question of law that must be determined in light of the factual circumstances. *Judge v. Blackfin Yacht Corp.*, 357 N.J. Super. 418, 426-27 (App. Div. 2003) (citing *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 135 N.J. 182 (1994)).

The plaintiffs allege that Ford knowingly concealed a host of material facts, all of them related to the occurrence of galvanic corrosion in the aluminum hood panels of the subject vehicles:

- "Ford[] fail[ed] to disclose that the Mustang hood panel was made of aluminum."

- "Ford…omitted to tell consumers that most body shops lacked experience with the repair of aluminum body panels."

- "Ford…omitted to tell consumers that it had not performed adequate corrosion testing on Mustang hoods prior to launch."

- "Ford…concealed that its corrosion tests, which had been developed for use on steel body panels, did not work with aluminum."

- "Ford…omitted to tell consumers that no adequate repair procedure existed for Mustang hood panels made of 6111 alloy."

- "Ford…omitted to tell consumers that its internal warranty data demonstrate that the Mustang aluminum hood panel was five times more like to experience corrosion than the aluminum panels used on other Ford vehicles."

(Pl. Br., Dkt. No. 87, at 9).

Ford contends that the plaintiffs have not raised a material factual dispute with regard to the unlawful conduct element of their omissions claim. I agree and will grant summary judgment on Count I.

### a. No Duty of Disclosure

Ford argues that it violated no duty to disclose the alleged material facts relating to steel-on-aluminum galvanic corrosion.

I pause to state some first principles. Perfection, or an unlimited life span, is not attainable; nor can a plaintiff convert that impossible standard into a cause of action by alleging that the manufacturer should have warned consumers that this is so. Relatedly, design tradeoffs are inevitable. Metal, for example, is heavier but stronger than plastic; it does not follow that a plastic dashboard gives rise to a cause of action because a metal one would last longer. In short, a CFA claim must be founded on the manufacturer's actionable false statements or omissions with respect to some condition or defect.

Automobile manufacturers commonly warrant their cars against failures for a period of time. Thus freedom from, *e.g.*, corrosion for a fixed period of years becomes part of the bargained-for exchange; if it occurs, the manufacturer must pay to remedy it. It is well known that metal corrodes and

13

that automobiles do not remain pristine indefinitely; that is the very reason for a warranty. So where, as here, the product was covered by a warranty, "it is not sufficient to allege that the defendant manufacturer knew that a part *might* fail before the warranty expired but concealed that knowledge." *Alban v. BMW of N. Am., LLC*, 2010 WL 3636253, at *10 (D.N.J. Sept. 8, 2010) (emphasis in original) (citing *Perkins*, 383 N.J. Super. at 111-12). To support a CFA cause of action for fraud in the context of a warranted defect, a plaintiff must show that the manufacturer was not in good faith insuring against a risk, but that it actually "knew *with certainty* that the product at issue or one of its components was going to fail."[8] *Tatum v. Chrysler Grp., LLC*, 2011 WL 1253847, *5 (D.N.J. March 28, 2011) (emphasis in original). Only then will a concealed, but warranted-against, defect furnish the basis for a CFA claim.

Ford acknowledges that metals corrode, but contends that it lacked the requisite level of knowledge of the alleged design defect which allegedly promoted steel-on-aluminum galvanic corrosion.

For model years 2004 and earlier, the issue is an easy one. Ford could not have had any knowledge—let alone certain knowledge—that galvanic corrosion of aluminum hoods would occur in the 2000-04 models. Those vehicles, discovery has revealed, did not have aluminum hoods. Rather, they had hoods made of "sheet molded compound." (Def. Facts, ¶49) It is undisputed that aluminum hood panels were not installed in Ford Mustangs until 2005, when the car was given a "complete redesign." (*Id.*) Since Ford did

---

[8]     The plaintiffs dispute the applicability of *Alban's* and *Tatum's* "certain to manifest" requirement. (See Pl. Br., Dkt. No. 87, at 26) "No court," they say, "has ever imposed this requirement for obvious reasons: a practice under the CFA can be unlawful even if no person was in fact 'misled, deceived, or damaged thereby.'" (*Id.* (citations omitted)) The plaintiffs' objection is misplaced. It is true that, unlike common law fraud, the CFA does not require actual reliance. *See Carroll v. Cellco Partnership*, 313 N.J. Super 488, 502 (App. Div. 1998). However, the "certain to manifest requirement" relates not to reliance, but to whether the defendant's knowledge rose to the level that created a duty to disclose, in the context of a warranted product.

not install aluminum hood panels on the Mustang until 2005, the alleged duty to disclose could not have arisen until the 2005 model year, at the earliest.

So I turn to 2005 and subsequent model years. Even for those later years, however, the record evidence does not present a material factual dispute as to whether Ford knew "with certainty" that the Mustang's aluminum hood would experience galvanic corrosion. *Tatum*, 2011 WL 1253847, at *5.

To begin with, the evidence has not borne out the plaintiffs' contention that Ford's design choices led to galvanic corrosion. The plaintiffs allege that the defect is inherent and its consequences inevitable: the "aluminum hood panel design change caused galvanic corrosion uniformly across *all of the subject vehicles*" because "*whenever* the...hood panels came into contact with iron-based parts, they sacrificed their electrons to the surrounding iron parts, thereby suffering a premature loss of structural integrity due to galvanic corrosion." (2AC, Dkt. No. 66, ¶¶30-31; emphasis added) So despite the warranty, plaintiffs say, Ford has committed a deceptive practice; Ford *knew*, as consumers did not, that galvanic corrosion would occur if aluminum touched steel.

Ford replies that whatever corrosion did develop was not galvanic. According to Ford (a) the corrosion was not observed in the few small areas of the hood where steel and aluminum are in contact, and (b) the quantity of steel is too small in comparison to the large aluminum hood panel to cause the galvanic corrosion claimed by plaintiffs. (Def. Facts, ¶58) Ford's expert metallurgist, Dr. Eric Guyer, states in a declaration that "there is no evidence of galvanic corrosion on Mustang hoods." (Expert Declaration of Eric P. Guyer ("Guyer Decl."), Dkt. No. 86-18, ¶¶25) Dr. Guyer opines that the corrosion complained of by the plaintiffs was actually "filiform" in nature.[9] (Guyer Decl., Dkt. No. 86-18, ¶¶14(b), 21) And while "there are multiple factors that affect

---

[9]     "Filiform corrosion manifests between a metallic substrate (e.g. aluminum or steel) and an organic coating. Filiform corrosion often initiates at a scratch or defect in the coating. This form of corrosion is often characterized by small, worm-like filaments propagating in random directions under the coating...." (Guyer Decl., Dkt. No. 86-18, ¶14(b))

whether any particular hood will develop [filiform] corrosion," Dr. Guyer asserts that "an important driving force is the infiltration of environmental electrolytes (e.g. salt water) into the hood hem"—not the galvanic reaction alleged by the plaintiffs. (*Id.* at ¶21)

The plaintiffs submit no expert report in response. Indeed, the plaintiffs now say in their Counter Statement of Material Facts that they "generally agree" with Ford's explanation. (*See* Pl. Facts, ¶D57-D58) Moreover, in their opposition brief, the plaintiffs appear to concede that the record evidence conclusively shows that the subject vehicles did *not* experience galvanic corrosion. (*See* Pl. Br., Dkt. No. 87, at 28) That fact is fatal to their claims. The mere presence of some kind of corrosion is not proof of a defect, or *a fortiori,* of consumer fraud; corrosion happens, and indeed is covered by Ford's warranty. What must be shown is concealment of a problem that Ford knew was bound to occur. Here the alleged defect is steel-on-aluminum galvanic corrosion, which has been disproven.

Ford contends that it reasonably believed that any corrosion afflicting the subject vehicles was filiform corrosion at the time it sold the plaintiffs their Mustangs.[10] It had no reason to suspect any unusual incidence of galvanic corrosion, and in fact galvanic corrosion does not seem to have been occurring. I again find Ford's reasoning compelling. Ford could not have known "with certainty" (or indeed, probably, at all) that the subject vehicles would develop galvanic corrosion. That lack of certainty regarding the occurrence of a defect relieves a manufacturer like Ford of the duty to disclose, *e.g.*, the existence of aluminum hoods with steel supports.

---

[10]     Steven Simko, a Technical Specialist at Ford, testified at his deposition that the engineers at Ford who worked on the corrosion issue believed that corrosion afflicting the Mustangs was filiform corrosion "in the 2005, 2006 time frame." (Deposition of Steven Simko, Dkt. No. 88-7, at 68:15-18) Mickens bought his Mustang on September 29, 2005, and traded it in for the second Mustang on March 18, 2011. (Def. Facts, ¶¶5, 23) Solomon bought his Mustang on May 31, 2011. (Def. Facts, ¶30)

"So What?!" say the plaintiffs;[11] corrosion is corrosion. That amounts to a request that I stretch the 2AC to allege that Ford knowingly concealed the subject vehicles' susceptibility to aluminum corrosion *in general* rather than—as the 2AC expressly alleges—"facts about the galvanic corrosion defect." (2AC, Dkt. No. 66, ¶74) But even if I did, the plaintiffs would be unable to raise a material factual dispute as to whether Ford had a duty to disclose.

First, as noted above, the evidence of galvanic corrosion has fallen apart. And filiform corrosion, even if present, has not been linked in the evidence to any defect; for all that appears in this record, it could result from peculiar environmental conditions, ordinary wear and tear, or some other cause. This *res* does not *ipsa loquitur;* it requires a showing that it was caused by something actionable. And the only alleged defective condition (contact between steel and aluminum) has not been linked to filiform corrosion.

Second—although perhaps of less importance—the record evidence demonstrates that these Mustangs developed corrosion fairly infrequently, at least within the warranty period. Ford cites warranty data showing that, for 2005–12 Mustangs sold in New Jersey, the overall incidence of corrosion for aluminum hoods ranged from 1.5–2.0%. (Def. Facts, ¶64) Not ideal, perhaps, but neither is it evidence that corrosion (whether galvanic or filiform) would "certainly" occur despite the assurances of the warranty.

The plaintiffs take issue with Ford's figures, but their evidence is inapposite. They cite an internal Ford study from October 2005 which found that "[b]ubbles/blisters/corrosion warranty numbers have spiked from 1 R/1000 [repair per thousand] to 18/R1000." (Ex. C-11, Pl. Facts, ¶D65, Dkt. No. 88-41, at 2) That study does not explicitly relate to Ford Mustangs or galvanic corrosion in particular; from the context, it seems to cover overall rates of corrosion in all Ford models with aluminum hoods.[12] Even on the

---

11      Literally. (Pl. Br., Dkt. No. 87 at 28)

12      The study was appended to a May 2, 2006 email, the subject line of which reads "2003 [Ford] Explorer Hood Corrosion." That email states that corrosion has been reported in the "F-series, Navigator liftgates, the new Mustang, Explorer, etc."

plaintiff-favorable assumption that the study referred exclusively to corrosion in Mustangs, an observed incidence of corrosion in 18 per 1000 vehicles is equivalent to a rate of 1.8%— within the range conceded by Ford. As noted above, this may be far from ideal, but it is even farther from a "certainty." At best, Ford had knowledge of the possibility that some kind of corrosion might arise in some of the subject vehicles—not of a certainty that corrosion (let alone *galvanic* corrosion) would occur. A defendant manufacturer does not violate the CFA by "failing to inform its consumers of the *possibility* of failure." *Alban*, 2010 WL 3636253, at *10 (emphasis in original). Nor is it wrongful to warrant against a problem that is likely, or even certain, to occur in a small percentage of vehicles; that's what a warranty is for. Ford's alleged omissions regarding the use of aluminum and the likelihood of corrosion were therefore not unlawful.[13] *See Arcand*, 673 F. Supp. 2d at 297 (there can be no unlawful conduct where there is no duty to disclose).

In short, the undisputed evidence, taken in the light most favorable to plaintiffs, suggests not a certainty of corrosion, but an incidence of 1.5–2%. Of course, *some* level of corrosion will inevitably occur, even absent any concealed defect. Galvanic corrosion is off the table, and plaintiffs suggest no other design defect. Moreover, corrosion is covered under Ford's warranty. A fact finder

---

((Ex. C-11, Pl. Facts, ¶D65, Dkt. No. 88-41, at 1) I note as well that the 2003 model precedes the introduction of the aluminum hood in the Mustang.

[13]    Indeed, Courts should be wary of imposing such a duty because it might render "meaningless" the New Jersey Lemon Law (the "Lemon Law"), N.J.S.A. § 56:12-29 *et seq. Perkins*, 383 N.J. Super. at 113. The Lemon Law requires automobile sellers and manufacturers to repair any defects that arise within the first two years after the sale of a new vehicle, N.J.S.A., § 56:12-33, or to refund the purchase price N.J.S.A. § 56:12-32. As the Court recognized in *Perkins*, the goal of this statute was to encourage automakers to adopt "voluntary remedial programs"—that is, warranties—that would establish the bare minimum for "what an automobile maker must do." *Perkins*, 383 N.J. Super. at 113 (citations omitted). "That purpose would not be served by permitting the maintenance of lawsuits such as that at hand, which, if successful, not only would render inconsequential the warranty programs adopted by auto manufacturers and consented to by purchasing consumers, but would also have a tendency to extend those warranty programs for the entire life of the vehicle." *Id.*

could not conclude from this record that Ford fell short of what a manufacturer must do.

Of course, the calculus might be different for a defect that truly affected the mechanical quality or safety of an automobile. Obviously a 1% brake failure rate and a 1% hood corrosion rate would present very distinct issues as to the manufacturer's duty to warn. Nor do I suggest that cosmetic corrosion is acceptable; that Ford's dealings with Mr. Mickens were ideal; or that Mickens might not have had a legitimate claim for breach of warranty.

But for the foregoing reasons, I find that the plaintiffs have failed to present a material factual dispute as to a particular issue: whether Ford's omissions amounted to consumer fraud as defined by the CFA. The omissions claim therefore fails as a matter of law. Summary judgment is granted as to Count I.

## 2. Count II – Deceptive Conduct

Count II, the plaintiffs' deceptive conduct claim, falls under the "affirmative act" branch of the unlawful conduct prohibited by the CFA. The common thread that pervades all types of unlawful conduct is "[its] capacity to mislead." *Cox*, 138 N.J. at 17 (citing *Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 378 (1977)). Allegations that a defendant's affirmative act—such as an affirmative misrepresentation—amounts to unlawful conduct do not require a showing of intent or even actual deceit. *See Cox*, 138 N.J. at 17–18; *see also Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 468 (App. Div. 2001). "One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605 (1997). A plaintiff need not even show reliance on the violation of the Act as long as an ascertainable loss resulting from defendant's conduct is demonstrated. *See Carroll v. Cellco P'ship*, 313 N.J. Super. 488, 502 (App. Div. 1998).

The plaintiffs allege that Ford deceived the putative class members by failing to update a technical service bulletin ("TSB") that was issued in 2006. Ford periodically releases TSBs to inform professional auto-repair technicians "of conditions that may occur on some vehicles, or provide[] information that could assist in proper vehicle service." (Dkt. No. 88-13, at 1) The 2006 TSB states that "[s]ome vehicles"—including the Mustang—"may exhibit a bubbling or blistering under the paint on aluminum body parts." (*Id.*) It then prescribes a repair procedure: "Corrosion should be removed by blasting" the affected area with "an aggressive blasting material, such as acrylic (salt grain size)." (*Id.*) The plaintiffs claim that the Ford knew this repair procedure was ineffective and could even exacerbate the damage. In 2010, for example, Ford began using a different repair procedure—an "overhem sealer"—to treat corrosion. Plaintiffs assert that although Ford made the sealer mandatory for all vehicles in 2013, it never updated the TSB to include the new repair method.

The problem with the TSBs, the plaintiffs say, was compounded by the warranties applicable to the subject vehicles. Corrosion repairs under Ford's three year/36,000 mile "Bumper to Bumper" warranty, the plaintiffs maintain, were performed using the faulty "blasting" technique set forth in the TSB. Plaintiffs allege that this renders the warranty deceptive because the repairs under the warranty did not cure the corrosion defect. The lulling effect of the warranty allegedly "prevented consumers from seeking an alternative to the 'sand and paint' repair, an extended warranty, or any other relief to remedy the Mustang hood corrosion problem." (Pl. Br., Dkt. No. 87, at 15)

Ford's five year/unlimited mile Corrosion Protection warranty, too, was allegedly deceptive. That five year warranty covers corrosion resulting in perforation of the vehicles' body panels. The deception, plaintiffs say, arose when "Ford secretly changed the Mustang hood panels to an aluminum alloy it knew would never perforate," while continuing to hold out the Corrosion Protection warranty as if were applicable to the entire vehicle. (*Id.* at 47)

I do not rule here as to whether the 2006 TSB and the warranties were sufficiently misleading to constitute affirmative acts of unlawful conduct under the CFA.[14] After reviewing the record, I find that the plaintiffs' deceptive conduct claims must nonetheless fail because the plaintiffs are unable to show that they suffered an ascertainable loss.

In *Thiedemann v. Mercedez-Benz USA, LLC,* 183 N.J. 234, 248 (2005), the New Jersey Supreme court clarified the meaning of the term "ascertainable loss" in the CFA. An ascertainable loss, the Court said, is "a claim of loss...supported by sufficient evidence to get to the factfinder." *Id.* That is to say, the plaintiff must proffer evidence that shows the loss is more than "hypothetical or illusory." *Id.* The loss must be presented with sufficient

---

[14]    There is something counterintuitive, however, about a claim based on an apparent *improvement* in the cars' design that rendered perforation less likely. Plaintiffs' position implies a preference for a design that would fail catastrophically, entitling them to make a claim under the five-year warranty.

"certainty" to demonstrate that it is "quantifiable or measurable," although the exact dollar amount need not be precisely calculated. *Id.* at 248-49.

> What might such a quantifiable or measurable loss look like?

> [I]t need not yet have been experienced as an out-of-pocket loss to the plaintiff. An estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss. We can envision the possibility that an expert may be able to speak to a loss in value of real or personal property due to market conditions, with sufficient precision to withstand a motion for summary judgment.

*Id.* at 249 (internal quotations and citations omitted). Here, even if the plaintiffs could prove that Ford engaged in unlawful deceptive conduct, they have not documented the loss occasioned by such conduct with the particularity required by *Thiedemann*.

*Thiedemann* instructs that the presence of a defect does not automatically create an actionable loss for the consumer. "Defects can, and do, arise with complex instrumentalities such as automobiles. The mere fact that an automobile defect arises does not establish, in and of itself, an actual and ascertainable loss to the vehicle purchaser." *Id.* at 251. That is especially so where the defect in question is "addressed by warranty, at no cost to consumer." *Id.* In that case, the consumer has not experienced "the predicate 'loss' that the CFA expressly requires for a private claim under the CFA." *Id.*

Solomon's case is the easier of the two. Solomon seeks to recover the cost of replacing his hood. He does not dispute that Ford offered to repair Solomon's hood under the warranty at no cost to him. (Pl. Facts, ¶D43) Solomon admittedly refused that offer because he personally believed it "was not going to fix the problem." (*Id.* at ¶D44) Under these facts, the amount Solomon spent on the replacement hood is not an ascertainable loss. The warranty offered by Ford in connection with the sale of the Mustang was "part of the benefit of the bargain between the parties." *Thiedemann*, 183 N.J. at 251. Pursuant to that warranty, Ford reserved the right to "repair, replace, or adjust all parts of [the] vehicle that malfunction or fail" during the term of coverage. (2011 Warranty

Guide, Dkt. No. 86-17, at 10). Ford opted to repair the hood at its own expense; it is not liable for the cost of a replacement, carbon-fiber hood simply because that was what Solomon preferred.

Solomon's theory of loss involves precisely the kind of speculation discouraged by *Thiedemann*. There, the Court rejected the Appellate Division's reasoning that the plaintiff successfully showed ascertainable loss because the defect in question might reappear after the alleged faulty automobile part had been replaced. *Thiedemann*, 183 N.J. at 244-45. That "future hypothetical diminution in value," the Court said, was "too speculative to satisfy the CFA requirement of a demonstration of a quantifiable or otherwise measurable loss." *Id.* at 252.

Solomon conceded at his deposition (and counsel concurs) that "*he believed* the problem with his hood could only be permanently fixed by installation of a replacement hood, so he bought one." (Pl. Br., Dkt. No. 87, at 32) (emphasis in original). A plaintiff-consumer's belief that a warranty repair would be insufficient does not entitle him to rewrite the warranty or engage in preemptive self-help at the manufacturer's expense. *See Perkins*, 383 N.J. Super. at 113 ("[R]ecognizing a viable CFA claim in the circumstances presented would essentially compel manufacturers and sellers to warrant their products and component parts beyond that to which the parties expressly agreed. Courts do not rewrite contracts into which parties have freely and voluntarily entered.") Solomon was, of course, free to decline the warranty repair, but he cannot saddle Ford with the costs of his preferred method of repairing the corrosion.

Solomon's claim of ascertainable loss is speculative; it is based on what he believes would have happened if he had permitted Ford to repair the hood. Because Solomon cannot demonstrate that he suffered any ascertainable loss as a result of Ford's alleged deceptive conduct, his deceptive conduct claim fails as a matter of law.

I turn my attention to Mickens. Mickens, too, is unable to demonstrate ascertainable loss under *Thiedemann*, although for different reasons. Mickens does not dispute that the corrosion on his car hood was repeatedly repaired under warranty—on one occasion even after the warranty had lapsed. But although those repairs were performed at no cost, Mickens proffers sufficient evidence that they were cosmetically inadequate. I cannot presume, however, that this significantly impaired the value of the car. I look to the proofs.

Mickens's claim of loss is that, but for the defect in the hood, he could have received more money when he traded in his 2006 Mustang and purchased a newer model. Mickens received a trade-in value of $17,000. He testified in his deposition that he believed he could have received anywhere from $19,000 to $21,000 for a car without the hood corrosion. (Mickens Dep., Dkt. No. 86-33, 209:1-211:10) After reviewing the evidence, however, I find that Mickens's testimony and a supporting expert report fall short of the "specific proofs to support or infer a quantifiable loss." *Theidemann*, 183 N.J. at 252.

Ford, the summary judgment movant, submitted a declaration of two well-credentialed vehicle valuation experts, Dr. David Harless and Dr. George Hoffer. Their economic opinion is based on market data. The report defines its methodology, reality-checks its data against comparison vehicles in the "pony car" submarket, analyzes depreciation rates, and so on. Harless and Hoffer state that according to the March 2011 edition of the *NADA Official Used Car Guide (Eastern Edition)*, the average "clean trade in" or best-condition value for a 2006-model Mustang with mileage comparable to that of Mickens is $16,550. That is $450 *less* than the $17,000 Mickens received for his allegedly impaired trade-in. (Joint Declaration of David W. Harless, Ph.D., and George E. Hoffer, Ph.D., Dkt. No. 86-23, at 15)

Mickens cites no evidence sufficient to create an issue of fact that he received less than the fair value of a Mustang without hood corrosion. Mickens's own unadorned opinion that the car was worth more than the $17,000 he got is not entitled to any weight. He proffers the report of an expert,

24

Charlie Barone, who estimates that the corrosion problem reduced the value of the 2006-model Mustang by "approximately 25% of the purchase price." (Dkt. No. 88-30, at 4) That report is fatally deficient. Mr. Barone spends three pages of his four-page report describing the corrosion problem, states that the appearance of a car is important to its value, and, in the final paragraph, announces that the vehicle's value is diminished by 25%. (*Id.*) Barone does not disclose any methodology or valuation process by which he arrived at that figure. He does no analysis. He offers no comparisons. He cites no data. He does not so much as allude to the car's blue book value.[15]

An expert report with such deficiencies is not of "sufficient precision to withstand a motion for summary judgment." *Thiedemann*, 183 N.J. at 249. The values of used cars are set by a market, but Barone's report says nothing about that market and contains no information about car prices. Mr. Barone's conclusion regarding the purported diminution in value of Mickens's Mustang amounts to a plucked-from-the-air "net opinion"[16] that would not be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2). It is well settled that "expert testimony that contains bare conclusions, unsupported by factual evidence" may be excluded. *Holman Enters. v. Fid. Guar. Ins. Co.*, 563 F. Supp. 2d 467, 471-72 (D.N.J. 2008) (citing *Buckelew v. Grossbard*, 87 N.J. 512 (1981); *see also Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir.1996) ("An expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts.")). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to

---

[15]   Ford's experts also demonstrate that if Barone's 25% figure were accurate, the actual depreciation data would be inexplicable. (ECF No. 86-23, pp. 13-15)

[16]   The term "net opinion," borrowed from state practice, is not a term of art under the Federal Rules of Evidence or a stated factor in the *Daubert* analysis. *See Zeller v. J.C. Penney Co.*, 2008 WL 906350, at *7 n. 13 (D.N.J. Mar. 31, 2008). It is rather "a restatement of the well-settled principle that an expert's bare conclusions are not admissible under [the fit requirement of] Rule 702 of the Federal Rules of Evidence." *Id.* I use it as a shorthand term only.

admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).[17]

Mickens has thus failed to submit admissible proofs having "a sufficient degree of reliability," *Thiedemann*, 182 N.J. at 252, to enable the factfinder to conclude that he suffered an ascertainable loss. Mickens's deceptive conduct claim, like that of Solomon, fails as a matter of law.

Summary judgment is therefore entered on Count II.

## V.   CONCLUSION

For the reasons set forth above, Ford's motion for summary judgment is **GRANTED.** The complaint is dismissed in its entirety without consideration of the class action allegations, because the two named plaintiffs do not possess viable CFA claims. An appropriate order will issue.

KEVIN MCNULTY, U.S.D.J.

Date: September 10, 2015

---

[17]   In addition, the report consists of a letter which is merely signed, not sworn. *See* Fed. R. Civ. P. 56(c)(1)(A); *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (An unsworn expert report "is not competent to be considered on a motion for summary judgment."); *Burrell v. Minn. Mining Mfg. Co.*, 2011 WL 5458324, at *1 n.1 (E.D. Pa. June 9, 2011) (refusing to consider the plaintiff's expert report on the defendant's motion for summary judgment because it "was not sworn to under penalty of perjury"). If the statements in the report were sufficient to create an issue of fact, I might grant leave to resubmit it in sworn form; as it stands, however, such a resubmission would be futile.